FILED

AUG 04 2022

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

1:22CV00785 LY

CARL A. WESCOTT
8210 E. Via de la Escuela
Scottsdale, AZ 85258
*in propria persona*
CARLWSOJ@GMAIL.COM
+1 936 937 2688

# UNITED STATES DISTRICT COURT

# DISTRICT OF TEXAS

CARL A. WESCOTT,

             Plaintiff,

vs.

WILLIAM "RANDY" RUSS;
LAS OLAS;
DAVID MAKSYMUIK;

             Defendants.

        + DOES 1 through 25

Civil Action No. _____

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT, PROMISSORY FRAUD; and NEGLIGENT MISREPRESENTATION;**

    Plaintiff Carl A. Wescott, proceeding *pro se,* complains of Defendants Mr. William Russ (who goes by "Randy Russ"); David Maksymuik ("Maksymuik"); and Las Olas.  In support of his legal complaint, the Plaintiff further alleges as follows:

**Concise Case Summary**

The Plaintiff formerly owned a company that owned two beach properties.  The Plaintiff had sold the properties to the Defendants, but the Defendants breached their contract.  The Defendants did not close on their contracted purchases and did not pay the Plaintiff monies owed.  The Plaintiff's company was suspended and no longer exists, and the properties he had sold were and are in foreclosure.  The properties are known between the Parties by shorthand names "P2" and "P3".

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; NEGLIGENT MISREPRESENTATION;**

**The Parties: Plaintiff and Defendants**

1. The Plaintiff is an individual presently residing in Scottsdale, Arizona.

2. Defendant Randy Russ is the 50/50 business partner of Mr. Maksymuik in a residential development known as "Las Olas". Russ' bio states

> "A disciplined and multi-faceted entrepreneur, Mr. Russ has acquired extensive experience over the past 35 years, in construction and real estate development business. As the President of very successful companies: Bobby Castle Construction – Russ Construction Company and of Texas Fixtures & Interiors, a commercial millwork and cabinet manufacturing company located in Texas, Mr. Russ has been responsible for acquisition, planning, sales, and construction of multiple projects throughout his career. He has constructed multiple developments including residential homes, high-rise buildings, retail shopping centers, businesses, and industrial parks across the United States."

3. Las Olas is Mr. Russ's and Mr. Maksymuik's golf course residential resort community, featuring 1620 residences, a 650-acre private nature reserve, a seaside championship golf course, a beach club and space, a tennis club, equestrian, marina, health & wellness center, shops and restaurants. Technically, Las Olas' holdings are believed to be in two Ecuadorian companies which are owned by a Belize Foundation controlled by Russ and Maksymuik, but for all intents and purposes Las Olas is run as a partnership between Russ and Maksymuik. In reality, "Las Olas" is a 50/50 partnership between Russ and Maksymuik in which Russ has put many millions of dollars more than Maksymuik, and thus should actually be a 90/10 partnership between Russ and Maksymuik, respectively. Russ could easily assert his rights as the true owner of Las Olas. Russ has pumped those additional millions of dollars into Las Olas from his home base of Austin, Texas, where he resides and works. Regardless of the partnership stakes on paper and what they should be, Russ and Maksymuik are partners in the business of Las Olas, sharing profits and losses.

2

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

4. Defendant David Maksymuik is Mr. Russ' partner in the residential development known as "Las Olas". In 2017 Mr. Maksymuik made offers on behalf of his and Mr. Russ' partnership to purchase of each of the beach properties (P2 and P3) for US $1.236 million. The offers were accepted. Maksymuik's bio states

> "Mr. Maksymuik holds a degree in Commercial Finance from the University of Western Ontario, as well as accounting designations in both the United States of America and Canada. He has spent the last 30 years providing financial leadership and strategic direction to rapidly expanding companies in renewable energy, construction, marketing, and transportation industries. His vast experience includes structuring and arranging financing for renewable energy and construction projects totaling in excess of $1.0 billion. Over a 15-year period he coordinated the financial and management reporting systems for large construction projects across the United States and Canada. He was instrumental in taking two separate companies public, on the New York Stock Exchange and the Toronto Stock Exchange. He has been involved in M&A activities throughout his career purchasing more than twenty-five companies during that period."

**Related Parties**

5. Mr. Jeff Barringer, along with his ex-wife Tammy Barringer, were the original owners of P2, P3, and P1 when the three parcels were all one property. The Plaintiff owes Mr. Barringer over US $535k in mortgage debt on P2 and P3.

6. Edward Berr is a California-based mortgage, loan, and investment broker who put together a syndicate of twenty-seven investors who share 27/28ths of the mortgage debt on related and neighboring property P1. (Ms. Laura Roden has the last 1/28th tranche).

7. The Plaintiff could not find Las Olas Enterprises, Inc., listed by Mr. Maksymuik on LinkedIn, as a company in good standing with the Texas Secretary of State. Once the Plaintiff locates Las Olas Enterprises, Inc., he will add Las Olas Enterprises as a Defendant.

3
**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

**Further allegations regarding conspiracy between defendants**

8. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, Mr. Randy Russ and Mr. David Maksymuik, as individuals, in addition to acting for himself and on his own behalf individually, as well as for the benefit of their marital communities, are and were acting as the agent, servant, employee, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the other Defendants (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

9. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all the other Defendants. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate, including Las Olas).

10. In addition, upon information and belief, there are even more nefarious corporate, trust, and other entity type Defendants beyond Las Olas involved in these conspiracies, currently unknown to Plaintiff. They shall emerge with the benefit of legal discovery.

11. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any and all such corporate entities, along with Las Olas, in addition to acting for itself and for its own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (entity and

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

individual) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

12. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all of the Defendants.

13. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

**Jurisdiction and Venue**

14. Mr. Randy Russ lives and works in the Austin, Texas metropolitan area.

15. Mr. Russ runs Las Olas from his Hutto, Texas office on Limmer Loop Road.

16. The Las Olas partnership is also run from the same office at 3874 Limmer Loop Road in Hutto.

17. Mr. Maksymuik, the other Founding Partner, also offices at 3874 Limmer Loop, using and publishing that address for many business purposes, including those of Las Olas (Exhibit A1).

18. On LinkedIn, Mr. Maksymuik lists Las Olas as "Las Olas Enterprises, Inc.", and having done business in and via Hutto, Texas, for almost eleven (11) years (Exhibit A2).

19. This is an action for damages pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and a claim for damages greater than US $75,000. The alleged damages are explained in further detail below as they are critical to this Court establishing subject-matter jurisdiction.

20. Supplemental jurisdiction over the Plaintiff's state law claims is pursuant to 28 U.S.C. § 1367.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

**Subject-Matter Jurisdiction – Legal Standards**

21. With damages of $75,000 and the diversity of citizenship of Plaintiff and Defendants, the Plaintiff qualifies for United States District Court under 28 U.S. Code § 1332(a)(1):

> DIVERSITY OF CITIZENSHIP; AMOUNT IN CONTROVERSY; COSTS
>
> **(a)** The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
> **(1)** citizens of different States;   *(28 U.S. Code § 1332 (a)(1))*

22. The Plaintiff resides in Arizona and the other Defendants are citizens of this district and/or *de facto* citizens of this district.

23. Thus, the parties have complete diversity of citizenship.

24. To qualify for federal court under complete diversity of citizenship, the amount in controversy must exceed the sum or value of $75,000, exclusive of interest and costs *(28 U.S.C. § 1332(a) (2014))*.

25. The determination of the amount in controversy for federal subject matter jurisdiction is an issue decided under federal law. 14AA FEDERAL PRACTICE AND PROCEDURE § 3702 (4th ed. 2014) [hereinafter "FEDERAL PRACTICE"]. See *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 352 (1961).

26. Federal courts will, however, look to applicable state law to determine the nature of the plaintiff's substantive claim and related damages. FEDERAL PRACTICE § 3702. See *Horton*, 367 U.S. at 352-353.

27. Numerous courts, including the United States Supreme Court have held that the amount in controversy for jurisdictional purposes is measured by the direct pecuniary value of the right that

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

the plaintiff seeks to enforce or the value of the object that is the subject matter of the suit. FEDERAL PRACTICE § 3702.5. See *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L. Ed. 1067 (1947).

28. The direct pecuniary value of the right is simply an estimate of the total amount in dispute rather than an assessment of liability. *Lewis v. Verizon Communications, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010).

29. The amount in controversy is determined without considering accrued or accruing interest or the costs associated with the lawsuit. (*28 U.S.C. § 1332(b)*)

30. Courts have held that collateral effects will not be taken into account when calculating the amount in controversy. FEDERAL PRACTICE § 3702.5. See *Healy v. Ratta*, 292 U.S. 263, 267 (1934) ("the collateral effects of the decree, by virtue of stare decisis, upon other and distinct controversies, may not be considered in ascertaining whether the jurisdictional amount is involved, even though their decision turns on the same question of law."). See also *New England Mortg. Sec. Co. v. Gay*, 145 U.S. 123, 130 (1892) ("It is well settled in this court that, when our jurisdiction depends upon the amount in controversy, it is determined by the amount involved in the particular case, and not by any contingent loss either one of the parties may sustain by the probative effect of the judgment, however certain it may be that such loss will occur.").

31. The amount in controversy may include compensatory damages including general and special damages such as pain and suffering and out of pocket loss. The amount in controversy may also include punitive damages. *Anthony v. Security Pac. Fin. Servs., Inc.*, 75 F.3d 311, 315 (7th Cir. 1996); *Watson v. Blankinship*, 20 F.3d 383, 386-387 (10th Cir. 1994).

7
**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

**Underlying Facts and Background Context: the Plaintiff becomes a developer in Ecuador**

32. The Plaintiff was a longtime information technology consultant who began to invest the money he was making in Silicon Valley into real estate.

33. The Plaintiff had purchased over seventy (70) residential properties in California and next became a residential real estate developer in many countries in Central and South America, including Ecuador.

34. After selling out multiple developments in the Andes, including in Vilcabamba, the Plaintiff began buying beach properties near Bahia de Caraquez, "Bahia".
   (https://www.planetandes.com/ecuador/pacific-coast/manabi/bahia-de-caraquez/)

35. Bahia is a town of 25,000 residents, located on the south side of the Rio Chone river, where it meets the Pacific Ocean.

36. Bahia features good restaurants, clean, paved roads, and a museum of archeology and art.

37. Back around 2005 and 2006, when the Plaintiff began to come to the Bahia are, beach-front properties in the area were available for reasonable prices well under $1/sq. meter.

38. The Plaintiff purchased nine kilometers of beach in the area and began to plan a combination of land banking and sustainable development from the southern end of Bahia to San Clemente.

39. The Plaintiff asked his real estate agent, Wayne Stauble, to map out the entire area from Bahia to San Clemente.

40. Mr. Stauble and the Plaintiff mapped out all properties from north of the Pajonal road to Bahia in one numbering system, and another system for all properties south of the Pajonal Road to San Clemente.

8

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

41. This was an intermediate step to acquiring many of those properties by contacting their owners and entering in to purchase contract.

**The Plaintiff acquires a 2 kilometer beach property and subdivides it, creating P1, P2, and P3**

42. Early in that process of developing sustainable communities along Ecuador's coast, the Plaintiff had acquired one property in particular, just south of the Pajonal road to the beach, which had two kilometers of beach, a shrimp farm and factory, and an airstrip.

43. The Plaintiff had acquired that property from Mr. Jeff Barringer and his wife, who had graciously seller-financed the acquisition.

44. The Plaintiff then subdivided that property into three roughly-equal sized properties, each of which had approximately 700 meters of beach.

45. The northern-most of those three properties shall be referred to as Property 1, or "P1".

46. The middle of the three properties is "P2", and the southern-most is "P3."

47. The Plaintiff paid the Barringers off for Property 1.

48. The Plaintiff still owes Mr. Barringer approximately US $535,500 as of August 1st, 2022 on the southern-most two properties.

**The Emergence of Las Olas and Mr. Russ and Mr. Maksymuik's desire to purchase P1/P2/P3**

49. North of P1, Mr. Russ and Mr. Maksymuik's Las Olas real estate development partnership purchased over three thousand one hundred and two acres for its championship 18-hole golf course, 1620 residences, luxury spa and resort, and other amenities.

9
**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

50. In 2017, while visiting Bahia, the Plaintiff had lunch with Mr. Maksymuik, who expressed an interest (on Mr. Russ' and his behalf) in purchasing all three properties from the Plaintiff.

51. The Plaintiff stated that he would sell each of the properties for US $1,236,000 (this number is from memory. The Plaintiff calculated the debt he had to Mr. Barringer per property at the time, believed to be $236,000, and added the million dollars he wished to clear on the southern-most properties).

52. The Plaintiff stressed to Mr. Maksymuik that he was financially challenged at that moment, and that he needed a quick close on at least one of the two properties if Mr. Maksymuik was serious.

53. Mr. Maksymuik told the Plaintiff that though he and Mr. Russ were quite familiar with the properties due to their ownership of many neighboring properties that it would take some time for a close of a purchase.

54. The Plaintiff then asked if it would be possible for Mr. Maksymuik or Mr. Russ to loan him some money until they could do a formal contract or get to a property purchase close.

55. Mr. Russ agreed to lend the Plaintiff some money to tide him over until the parties could formalize Mr. Russ' and Mr. Maksymuik's purchases of P1, P2, and P3.

56. Mr. Russ subsequently lent the Plaintiff US $10,000, which Mr. Russ sent in two wires of $5,000 each.

**Mr. Russ and Mr. Maksymuik's contractual purchase of P1**

57. In 2017, the Plaintiff was a California resident.

58. In late August 2017, Mr. Russ and Mr. Maksymuik flew out to California for several days of meetings with the Plaintiff to arrange the property purchases.

10

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

59. Because the Las Olas development was north of the Plaintiff's properties, Mr. Russ and Mr. Maksymuik decided to first buy P1, before moving on to P2 and P3.

60. At the time, P1 had a mortgage on it that was syndicated between twenty-eight investors who each owned a "slice" of the mortgage.

61. Russ and Maksymuik wished to make a series of payments first to pay off the mortgage, and then to the Plaintiff, who, in his abject poverty, was quite flexible and willing to seller-finance that transaction.

62. Before Mr. Russ and Mr. Maksymuik left California in early September 2017, Mr. Russ and Mr. Maksymuik, as buyers for P1, and the Plaintiff, as the former beneficial owner of P1, had signed a contract by which Russ and Maksymuik would buy P1 from the Plaintiff over a period of thirteen months.

63. (The Plaintiff negotiated a deal - on behalf of Mr. Russ and Mr. Maksymuik - with the holders of the mortgage debt on P1 to enable the purchase).

64. Each month from September 2017 to October 2018, Mr. Russ wired a set amount to the mortgage holders.

65. By October 2018, Mr. Russ had paid off the mortgage on P1, fully performing on his contractual obligations.

66. The P1 purchase contract is not the subject of this particular legal complaint.

67. However, P1 details are included for context as to what occurred in parallel with P2 and P3.

68. Mr. Russ and Mr. Maksymuik were unable to close on the purchase of P1 in late 2018 as expected and as per the contract.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

69. One reason for that is that contrary to the contract that the Plaintiff signed with Edward Berr, Mr. Berr had refused to rescind the first mortgage that he and his investors had on P1.

70. Thus, Mr. Russ and Mr. Maksymuik's representations that they didn't have the money to close on the purchase of P1 in late 2018 were not the only reason that they were unable to purchase P1.

**Mr. Russ and Mr. Maksymuik's purchase of P2 and P3**

71. Mr. Maksymuik, as agent for Mr. Russ and for their Las Olas partnership, provided written purchase offers for P2 and P3 in 2018.

72. The purchase price for P2 was US $1,236,000.

73. The purchase price for P3 was US $1,236,000.

74. The Plaintiff accepted both offers in writing, thus forming contracts with Russ and Maksymuik.

75. Though the Defendants were familiar with P2 and P3, they did some due diligence.

76. In late 2018, Mr. Maksymuik informed the Plaintiff that he and Mr. Russ would purchase P2 and P3 and that they would no longer have a contingency to pull out of the deal.

77. However, for all three properties, P1, P2, and P3, Russ and Maksymuik stated that they didn't have the money, were still committed to purchasing, but would need more time.

**Values of P2/P3 were reasonable / Potential Damages from a Promissory Estoppel standpoint**

78. There is a concept in real estate valuation, the "highest and best use," which then carries into legal principles of valuation including the calculation of damages (Exhibit B).

79. Mr. Russ and Mr. Maksymuik already have invested millions of dollars into the infrastructure in the nearby Las Olas development, including a mailing list and marketing and sales infrastructure.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF
CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

80. Russ and Maksymuik also had a local sales office and sales team, and thus the two partners and their partnership ("the Partners") can most easily monetize P2 and P3.

81. Applying the principles of highest and best use hereto, P2 and P3 are worth more to the Partners than anyone on the planet.

82. The Partners could have, and still can, easily sell lots within P2 and P3 to pay the Plaintiff the agreed-upon purchase price.

83. Conversely, by committing P2 and P3 to the Partners, the Plaintiff has been deprived of the opportunity to monetize P2 and P3 himself. (The Plaintiff fully admits that he has lacked the resources to do so, but the Plaintiff does have a history of being able to borrow money, and back when he still owned the company that owned P2 and P3, he could have used second mortgage debt for funding, and/or could have restructured the first mortgage with Mr. Barringer)

84. Let us examine what sort of cash flow P2 and P3 could generate in the hands of the Partners.

85. In the greater Las Olas property, the Partners retained 650 hectares for a preserve and 606.14 hectares for properties and amenities.

86. Thus, the Partners utilized 48.25% of the neighboring real estate for for-sale real estate and supporting amenities.

87. The Partners have already invested millions of dollars in the 18-hole championship golf course next door, and other amenities.

88. The Plaintiff has personal knowledge of the details of the sale of Las Olas' first lot, which was sold at a heavily-discounted price of US $100,000.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

89. For some period of time, the Partners were selling Founding Packages to Las Olas with lots of 500 sq. meters, 1500 sq. meters, and 1600 sq. meters with lots valued at US $300,000 and US $100,000 (Exhibit C).

90. Thus, Las Olas was selling at over US $166/sq. meter in the special Founding Packages, which now are no longer available (as per the Las Olas web site).

91. Applying the same ratios and numbers to the neighboring properties, P2 and P3, which are arguably superior because they are essentially all beach properties, P2 and P3 each had 228,061 sellable square meters.

92. Assuming an equal distribution of first row beach lots (@ $300,000) and second row beach lots (@ $100,000), the total revenue from selling lots on P2 and P3 could have been $37,858,126 per property, or $75,716,252 total.

93. Of course, the Plaintiff would never stack lots at such density in such a pristine setting.

94. Further, such a project would require a road (already completed) and millions more in infrastructure for water, electricity, and septic (which, arguendo, could be funded by borrowing against the value of the entitled land.

95. The Partners could have borrowed against their own entitled land, appraised at over US $50,000,000, to meet their promises and obligations.

96. From the Plaintiff's viewpoint, the Partners *should* have borrowed if necessary to meet their obligations.

97. Instead, the Partners, who had locked up the P2 and P3 properties, just made promises and promises, insisting that they would close on the purchases.

14
**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF
CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

98. Mr. Russ was kind enough to make a series of loans to the Plaintiff, that were supposed to unwind at the promised close of the purchases of P1, P2, and P3.

99. Exhibit D has a summary of the loans from Mr. Russ to the Plaintiff related to his purchases of P1, P2, and P3 in 2017, 2018, 2019, 2020, 2021, and 2022, which totaled $132,700.

100. The Plaintiff believes the actual total is slightly higher, as there are likely some missing loans where the Plaintiff is missing his emails/records.

101. A floor value on what the Plaintiff owes Mr. Russ for loans on P2 while making lulling promises is therefore $44,233 of principal, and the same value for P3.

102. The Plaintiff therefore owes Mr. Russ at least US $88,466, and any reasonable interest rate that the Parties shall decide or that this Court might set in the future.

**Ramifications of the Partners' continuing series of Breaches**

103. Unfortunately, the Partners' continuing series of breaches and not closing on their contractually-committed purchases has resulted in a number of ramifications for the Plaintiff.

104. The Plaintiff should have had millions of dollars, or at least payments towards such, beginning years ago.

105. Due to the Partners' breaches of contract, the Plaintiff is entitled to consequential damages, and the consequences are significant, both on the downside and also on the potential personal and business collateral opportunities that the Plaintiff should have engendered over the past years.

106. Beginning with the downside consequences, the Plaintiff has been living in abject poverty, without enough money to pay his bills or support his business pursuits.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

107.   While the Plaintiff appreciates the loans made by Mr. Russ, they are but a tiny fraction of monies he was to have received long ago.

108.   The Plaintiff has not been able to afford to hire an attorney for the benefit of his three minor boys, who should have their father in their lives... the Plaintiff, a father to three boys, should have the joy and responsibilities of fatherhood in his life, and therefore a meaningful existence.

109.   The Plaintiff, a legal layperson, plans to amend this legal complaint to add a cause of action for Promissory Estoppel, which he believes applies here.  In the Partners' tying up the properties, the Plaintiff, a former real estate developer, was deprived of the opportunity to monetize them himself.

110.   At this point, the Plaintiff is years behind on the necessary filings for his former entity, which now has been suspended and no longer exists.

111.   The Plaintiff believes that with the hiring of accountants, attorneys, and other professionals, that despite his former entity being suspended and then dissolved, that it should be possible to resuscitate his former entity or come up with another solution to effectuate the Partners' purchase, resources and expertise willing.

112.   However, in the meantime, even worse disasters loom on the horizon.

113.   The Plaintiff has knowledge of Mr. Barringer hiring an attorney to foreclose on the properties.

114.   Indeed, P2 and P3 were in foreclosure.

115.   Mr. Barringer has threatened further legal action against the Plaintiff.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

**Further lost collateral opportunities**

116.   In the past, the Plaintiff had a history of raising capital as a former real estate broker and mortgage broker and consultant.

117.   He believes that with some financial stability, he could have made significant compensation raising money for clients, including real estate developers.

118.   In fact, the Plaintiff had one such opportunity in 2018 in Korea, where he negotiated a US $7 million fee, the first of four fees and raises that were agreed to with a Korean client, three of which were quite possible to effectuate in the then-market.

119.   Unfortunately, due to one other factor, but also the Plaintiff's lack of resources, he could not complete such assignments.

**Early June 2022 conversation with Mr. Russ**

120.   About two months ago, in early June 2022, after almost four years of promises, Mr. Russ informed the Plaintiff in a phone call that he expected to get a very significant amount of money imminently and "any day now", with which he could cash the Plaintiff out.

121.   Unfortunately, in the same call, Mr. Russ informed the Plaintiff that if that large amount of money did not arrive, Mr. Russ would be unable to complete the purchase of the properties.

122.   Mr. Russ was to call if he got the money or wished to work something out.

123.   That phone call is documented in Exhibit E.

124.   Mr. Russ has now not only breached for the final time, but also has repudiated the Parties' contracts.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

**Righting the Scales of Justice**

125.    The Plaintiff has not heard from Mr. Russ, but he believes that Mr. Russ has the resources to meet his obligations and commitments.

126.    More germane to the processes at hand, Mr. Russ has the resources to pay for the consequences of not doing so and the damages the Partners have caused.

127.    The Plaintiff, unfortunately, has been left with no choice but to file this legal complaint in hopes that justice can be served.


**Jury trial**

128.    Under the Seventh Amendment to the United States Constitution, the Plaintiff has a right to a jury trial for his Constitutionally-protected petitioning rights. (Also, as per *Fed. R. Civ. P 38(b)*).

129.    The Plaintiff hereby respectfully requests a jury trial on all issues raised herein, including all triable facts and issues related to his current causes of action and any facts, issues, requests, and/or causes of action that the Plaintiff or his future attorney may add within the timelines allowed by this Court.


**Count I – Breach of Contract**


130.    The Plaintiff realleges paragraphs 1-129 as if fully set out herein.

131.    The Plaintiff entered into valid, binding contracts with Mr. Russ and Mr. Maksymuik for the Partners to purchase P2 and P3.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

132.   The Plaintiff fully performed and there were no issues in due diligence.

133.   There is no contingency and no LD ("liquidated damages") by which the Partners can now pull out, four years later, after four years of broken promises.

134.   Mr. Russ and Mr. Maksymuik breached the parties' contract by refusing to pay Plaintiff the US $2,472,000 owed.

135.   The Plaintiff has been damaged as a result of the Defendants' breaches and repudiations by losing US $2,472,000 as of late 2018, as well as prejudgment interest, and the consequences of not having that money (both business and personal).

136.   All allegations and specific consequential damages to be fully proven at jury trial.

## Count II – Promissory Fraud

137.   The Plaintiff realleges paragraphs 1-129 as if fully set out herein.

138.   In 2017 and 2018, Russ and Maksymuik induced the Plaintiff to enter into the parties LICO-related contracts by representing that he fully intended to honor those contracts.  We shall refer to the Partners' such representations over time as "the Representations."

139.   As fraud must be pled with specificity and particularity.   Maksymuik made his Representations over lunch in Bahia, and Russ and Maksymuik made their joint Representations in in-person meetings in California in late August and early September 2018.

140.   Russ knew at the time he made the Representations that he had no intention to honor his contracts with the Plaintiff.

141.   Indeed, Russ did not honor the contracts.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

142. Maksymuik knew at the time he made the Representations that he had no intention to honor his contracts with the Plaintiff.

143. Indeed, Maksymuik did not honor the contracts.

144. Russ made the Representations for the express purpose of inducing the Plaintiff to rely.

145. As Russ foresaw and intended, the Plaintiff reasonably relied on the Representations.

146. The Representations were material in that the Plaintiff would not have entered into the contracts nor began to perform nor performed as much as he could in the circumstances without them.

147. Maksymuik made the Representations for the express purpose of inducing the Plaintiff to rely.

148. As Maksymuik foresaw and intended, the Plaintiff reasonably relied on the Representations.

149. The Representations were material in that the Plaintiff would not have entered into the contracts nor began to perform nor performed as much as he could in the circumstances without them.

150. The Plaintiff has been damaged as a result of his reliances on the Representations by losing US $2,472,000 as of late 2018, as well as prejudgment interest, and the consequences of not having that money (both business and personal).

151. All allegations and specific consequential damages to be fully proven at jury trial.

## Count III – Negligent Misrepresentation

152. The Plaintiff realleges paragraphs 1-129 as if fully set out herein.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

153. Pleading in the alternative, at the time Russ and Maksymuik made the Representations Russ was acting in his professional capacity and had a pecuniary interest in the underlying transaction.

154. Russ and Maksymuik failed to exercise due care in making the Representations.

155. The Plaintiff justifiably relied on the Representations.

156. The Plaintiff has been damaged as a result of his reliances on the Representations by losing US $2,472,000 as of late 2018, as well as prejudgment interest, and the consequences of not having that money (both business and personal).

157. All allegations and specific consequential damages to be fully proven at jury trial.


WHEREFORE, PLAINTIFF PRAYS:


(a) As to Count I for all direct and consequential damages the Plaintiff incurred as a proximate result of the Defendants' breaches of contract and repudiations;

(b) As to Count II for all direct and consequential damages the Plaintiff incurred as a proximate result of the Partners' promissory fraud along with the imposition of exemplary damages to deter the Partners from committing such acts of fraud in the future;

(c) As to Count III for all direct and consequential damages the Plaintiff incurred as a proximate result of the Partners' negligent misrepresentations along with the imposition of exemplary damages to deter Russ from committing such acts of fraud in the future;

(d) For reasonable compensation for the value of his time in representing himself while he cannot afford an attorney (*quantum meruit*);

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

1      (e) For reasonable future attorney's and paralegal fees and costs including travel costs and for

2          the costs of this action and;

3      (f) For such other and further relief as this Court deems just and proper.

4

5

6

7    RESPECTFULLY SUBMITTED

8

9

10   Carl A. Wescott, *pro se*
     August 1st, 2022

11

12

13   _____

14

15               **VERIFICATION**

16   I, Carl A. Wescott, under penalties provided by law pursuant to section § 1-109 of the Code of Civil
     Procedure, as well as the federal laws of the United States of America, certify that the facts set forth

17   in this instrument are true and correct, except as to matters therein stated to be on information and
     belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same

18   to be true.

19

20                                                 Carl A. Wescott

21

22

23

24

25

26                                    22
           **PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF
       CONTRACT; PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;**

**zoominfo** by

| Top Companies | Solutions | Pricing | Our Data |

Industry

Overview     Company     Experience     Org Chart     News & Media     Similar Profiles          Search for a contact or compan

*EXHIBIT A1*

# David Maksymuik

⊘ Profile Privacy  ⧉  ⋘

### Founding Partner at Las Olas Ecuador

David Maksymuik is a Founding Partner at Las Olas Ecuador based in Hutto, Texas. Previously, David was a Vice President, Corporate Services at Ame...
Read More

( Contact )

## David Maksymuik's Phone Number and Email

📅 Last Update     5/11/2022 2:27 AM

✉ Email     d***@halmosholdings.com

📞 Contact Number     (***) ***-****

📱 Mobile Number     (***) ***-****

📞 HQ Phone     (512) 846-1998

🏢 Company     Las Olas Ecuador

📍 Address     3874 Limmer Loop, Hutto, Texas, 78634, Unit...

## David Maksymuik Current Workplace

Las Olas Ecuador

📍 **Location**
3874 Limmer Loop,
Hutto, Texas, 78634,
United States

🏢 **Description**
Las Olas offers you the opportunity to live in one of six unique, yet complementary communities. You can enjoy seaside living at its best, or play a world-class links golf course with

Leads                    ᵘ Industry

8/1/22, 5:49 AM (4) David Maksymuik | LinkedIn

  **Home**  **My Network**  **Jobs**



*Exhibit A2*

# David Maksymuik · 2nd
## Senior Vice-President & CFO at Las Olas Enterprises Inc.

- Las Olas Enterprises Inc.
-  Western University

Toronto, Ontario, Canada · Contact info

73 connections

 1 mutual connection: Norman C. Long

Connect  🔒 Message  More

## Activity
74 followers

**David hasn't posted lately**
David's recent posts and comments will be displayed here.

Show all activity →

## Experience

### Senior Vice-President & CFO
Las Olas Enterprises Inc.
Oct 2011 - Present · 10 yrs 11 mos
Hutto, Texas

 Vice President - Finance

8/1/22, 5:49 AM

(4) David Maksymuik | LinkedIn

 


Home


My Network


Jobs

**Vice-President - Finance**
Advantex Marketing International Inc.
Oct 1992 - Sep 1997 · 5 yrs
Toronto, Canada Area

## Education

 **Western University**
1999 - 2003

**Certified Management Account**
CMA Certificate

**Cetrified Public Accountant**
CPA Certificate

## Recommendations

**Received**      **Given**

**Nothing to see for now**
Recommendations that David receives will appear here.

## Interests

**Companies**     **Groups**     **Schools**

 **Ameresco**
25,653 followers

( + Follow )

 **Western University**
271,296 followers

( + Follow )

Highest and Best Use Defined | Real Estate Definitions | Real Estate Law Explained | Cases & Statutes | Authoritative & Comprehensive



EXHIBIT B



Home | ... | ... | ... | ... |

more real estate definitions

### highest and best use
As defined and explained in this ONLINE Encyclopedia

Highest and Best Use is the likely use, selected from a number of available choices, to which an area of land or a building may be put, based on what is physically possible and in compliance with zoning and building regulations and which, at the time of an appraisal, produces the most profitable present value of the land. The legal use of land or improved property which, at any point in time, is likely to produce the highest return to an investor (State Nat'l Bank of Conn. v. Planning and Zoning Comm'n of Town of Trumbull, 156 Conn 99, 239 A.2d 530 (1968); *Re Eddy Forest Products* (1991) 27 OMBR 85, 87 (Can)). "The most probable use of a property which is physically possible, appropriately justified, legally permissible, financially feasible, and which resultsin the highest value of the property being valued", International Valuation Standards Committee, *International Valuation Standards* (8th ed. London: 2007), § 6.3.

An area of land may be considered to be at its highest and best use when it provides the optimum return to its owner or user, which may be as measured in monetary terms, or in intangible and social values, or a combination of such values. However, this value is not static. The use of land at any point in time is dependent on the legally permitted use, that which is physically and financially viable and the most productive use. In particular, highest and best use of land is a function of the land's 'capacity'—its ability to provide fruits and benefits. In turn this ability is a function of physical characteristics (slope, fertility, climate, load bearing capacity, etc.); the permitted or authorised use (agricultural, residential, industrial, mining commercial); intensity of use (the permitted plot or floor area ratio, planning and building height restrictions, etc.); location (accessibility, proximity to complementary uses); technological factors (building techniques, availability of plant and machinery); and the availability of other factors of production (labour, capital and management) to exploit the full potential of land. The use to which land is put is a function also of the owner's tastes and preferences and will be dependent on the demand of the end user. 'Highest and best use' represents a dynamic concept, a point to which land is tending. Landowners, or potential landowners, are constantly seeking to obtain a higher return from a given area of land than would be receivable by continuing the existing use. However, at any point in time, one use may be considered as the one that provides a higher and better use than any other. It is upon the basis of that use that an appraisal of land is generally carried out.

In the US and Canada, apart from its use in the general appraisal of real estate, 'highest and best use' may be applied when assessing just compensation for condemnation, i.e. account should be taken of a reasonable probability that a zoning change would be permitted; but not a special use available only to the acquiring authority, or any special purpose for which the property is being acquired. "All [the land's] capabilities or uses to which it may be adapted should be considered in order to determine the market value.' Joyce on Damages, § 2135. ... the test is not the value for a special purpose, but the fair market value of the land in view of all the purposes to which it is naturally adapted", Sacramento Southern R. Co. v. Heibron, 156 Cal 408, 104 P 979, 980–1 (1909) (Olsen v. United States, 292 US 246, 255, 54

Highest and Best Use, defined and explained

S Ct 704, 78 L Ed 1236 (1934); United States v. Cors, 337 US 325, 69 S Ct 1086, 93 L Ed 1392 (1949); United States v. 50.8 Acres of Land, 149 F Supp 749, 752 (DC NY 1957); Weldon v. State, 495 So.2d 1112, 1117 (Ala Civ App 1985); *Krupa v Camel Resources Ltd* (1982) 40 AR 528 (Can)). Also, for the purpose of determining the assessed value, a property should be appraised on the basis of its highest and best use. Sometimes called the 'optimum use'. Cf. **existing use.**

Terms in bold are defined elsewhere in the Encyclopedia.
Further explanation of the style of reference material is provided in the User Guide (available to subscribers)

### *bibliographic references:*

Mark R. Rattermann. Highest and Best Use Problems in Market Appraisals (Chicago: Appraisal Journal, Winter 2008).
AIA & U.S. Department of Justice. Uniform Appraisal Standards for Federal Land Acquisitions (5th ed. Chicago: 2000), § A-23 'Analysis of Highest and Best Use'.
Appraisal Institute. Readings in Highest and Best Use (Chicago: 1981).
Appraisal Institute. The Appraisal of Real Estate (13th ed. Chicago: 2008), Ch. 12 'Highest and Best Use Analysis'.
S.F. Fanning. Market Analysis for Real Estate: Concepts and Applications in Valuation and Highest and Best Use (Chicago: 2005, with CD-ROM).
J.D. Eaton. Real Estate Valuation in Litigation (2nd ed. Chicago: 1995), Ch. 6 'Highest and Best Use'.
S. Fanning. Market Analysis for Real Estate (Chicago: 2005), Part III 'Highest & Best Use Analysis'.
J.D. Fisher & R.S. Martin. Income Property Valuation (3rd ed. Chicago: 2007), Ch. 19 'Highest and Best Use Analysis: Applications'.

Australian Property Institute. *Valuation Principals and Practice* (2nd ed. Deakin, ACT: 2007), pp. 6–7, 88, 96, 386.
International Valuation Standards Committee. *International Valuation Standards* (8th ed. London: 2007), pp. 28–9.

#### More Real Estate Terms

acceleration clause; bargain and sale; base fee; easement; emphyteotique lease; exclusive agency; *fructus*(Lat); grosses reparations(F); home valuation code of conduct (HVCC)(US); *immeuble*(F); leasehold enfranchisement; market value (MV); once a mortgage, always a mortgage; partial release (or the rule in *Dumpor's Case*); possession; resecuritization; resulting trust (and *Quistclose* trust); strata title; tenantable repair; Torrens title; unjust enrichment; waste

---

Terms & Conditions | Disclaimer & Legal Notice | Privacy Policy

© 2011 Doxa Alpha Publishing



# Founding Membership Alternatives

## PLATINUM PLUS FOUNDING MEMBER

Designed for corporate level and the leading club members interested in an exclusive membership

- 11 luxury 6-BR or 7-BR mega approximately 1,600 sq. meter size at the privileged value of 1.3/6s, valued at $1,495,000 USD
- 2 home sites valued at $200,000 USD per site
- 1 owner package worth $ 30,000 USD / yr
- Total investment value of $2,995,000 USD
- Founding Price:

40% discount with full payment in 12 months 1,237,000 USD
45% discount with full payment in 6 months 1,112,230 USD
50% discount with full payment **1,047,000 USD**

## PLATINUM FOUNDING PARTNER

Designed for corporate level partners interested in an exclusive membership and access to their personal residences

- 11 luxury 4-BR or 5-BR villa size approximately 1,200 sq. meter size at the privileged value of 1.3/6s, valued at $1,025,000 USD
- 1 home site valued at $120,000 USD
- 1 home site valued at $100,000 USD
- 1 owner package worth $ 30,000 USD / yr
- Total investment value of $1,490,000 USD
- Founding Price:

40% discount with full payment in 12 months  894,000 USD
45% discount with full payment in 6 months  819,300 USD
50% discount with full payment **745,000 USD**

## GOLD FOUNDING MEMBER

Designed for executive level and the leading club members interested in an exclusive membership and access to their personal residences

- 1 home site valued at $200,000 USD
- 2 home sites valued at $100,000 USD per site
- 1 package of owner weeks $ 30,000 USD / yr
- Total investment value of $1,130,000 USD
- Founding Price:

40% discount with full payment in 12 months  678,000 USD
45% discount with full payment in 6 months  621,500 USD
50% discount with full payment **565,000 USD**

## SILVER FOUNDING MEMBER

Designed for executive level and the leading club members interested in an exclusive membership and access to their personal villas

- 1 luxury 200-sq. villa size approximately 200 sq. meter size at the privileged value of 1.3/6s
- Home site valued at $120,000 USD
- 3 home sites valued at $100,000 USD per site
- 1 owner package worth $ 20,000 USD / yr
- Total investment value of $580,000 USD
- Founding Price:

30% discount with full payment in 12 months  346,000 USD
35% discount with full payment in 6 months  307,000 USD
40% discount with full payment **468,000 USD**

## PERSONALIZED MEMBER PACKAGE

We can custom design a membership package between the above 40% discount, keeps, member level investment more than $90,000 USD.



**Loans from Randy/Las Olas to unwind at the close of P1/P2/P3**

2017:  10k (two 5ks)

2017 through 2018:  Loans beginning in late 2017 related to P1 P2 P3:  13 * $5k = $65k

2019: ~$27.5K Second half of 2019 + $2k (Korea just before that) + laptop

2020: flight

2020, 2021, 2022:  As per attached, totalling $26,800

---

Randy, there may be more from the first half of 2019, but I can't find any (I don't think you did either)

The bitcoin transactions were part of the prior monthly accounting

I don't know how to value the flight but I propose $700, making 2020, 2021, 2022 total $27,500

I believe you spent less than $700 on the laptop, and thus 2019 is $30.2k base.

(Please check the first five months of 2019 and see if you sent me money, which we would then add)

Thus, so far we have:

- $10,000 (2017)
- $65,000 (loans related to P1/P2/P3 which we expected to unwind in late 2018)
- $30,200 2019
- $27,500 2020/2021/2022

   $132,700 (principal)

We may want to add interest.

We agreed to allocate the loans evenly across P1/P2/P3, so that would be $44,233+ of principal allocated to each.

Please let me know if you find anything in the first five months of 2018, which we would add.

| 2020 | | 2021 | | 2022 | |
|---|---|---|---|---|---|
| January | $ 5,000.00 | June | $ 1,000.00 | February | $ 1,000.00 |
| February | $ 5,000.00 | October | $ 500.00 | February | $ 5,000.00 LAST LOAN |
| March | $ 5,000.00 | December | $ 800.00 | | $ 6,000.00 |
| April | $ 1,000.00 | | $ 2,300.00 | | |
| July | $ 1,500.00 | | | | |
| August | $ 500.00 | | | | |
| October | $ 500.00 | | | | |
| | $ 18,500.00 | | | | |

8/1/22, 3:23 AM                                          Gmail - documenting our conversation

 Gmail                     Exhibit E          Carl Wescott <carlwescott2022@gmail.com>

## documenting our conversation
1 message

**Carl Wescott** <carlwescott2022@gmail.com>                              Sat, Jun 4, 2022 at 12:35 AM
To: texasfixtures@gmail.com, Carl Wescott <carlwescott2022@gmail.com>

Randy,

As you know, you and Las Olas entered into contract to purchase three properties in 2018, four years ago.

You've been making promises for four years and I've been quite patient.

While I appreciate the $100k+ you've loaned me along the way to help keep me going until the anticipated closings, unfortunately, your breaching our contracts has cost me many millions of dollars.

While I was encouraged to hear that you expect to have plenty of money early next week, I've been hearing that now for many months.  I hope you do, but I fear that you won't.

You do have assets and income/cash flow so if you wish to perform, you can.  It would be great to get a large payment, but the offers made to you this week don't require you to make a significant payment now.

Mr. Barringer is willing to extend his note in a no-money-down seller-finance over 10 years.  My new entity, too, would be willing to extend 10 years of credit, or whatever you need, to close on a first property.  (We could do another one two years later and so on).

I was disappointed to hear you state just now that if you don't have money early next week, that you will be unable to buy the properties, after I've waited for four years with promise after promise when you could not originally close on time.

I am sympathetic, too, to the fact that the ravages of the COVID-19 pandemic significantly reduced your main two businesses' income back in 2020 and a good part of 2021.

You're all too familiar with my situation and circumstances of abject poverty which lie in sharp contrast to the opportunities I have had to make money with just a little bit of money to do so, and the foundation of a home and stable life.

Your lack of closing has cost me many millions of dollars on top of the loss of the purchase prices, as you know all too well.  It's also been a major factor in not seeing my children, as I have been unable to afford an attorney.

If you change your mind and wish to either close at least one of the properties, or work out payments for non-performance, just let me know any time next week.

If I don't hear from you, I'll assume that your last word on this, that you're now unable to pay and won't close, is your final decision (and that of David and Las Olas and all other relevant parties).

In that case, I will be forced to sue you the following week to right the scales of justice, in which case I'll see you in court.

I may have to sue for specific performance, but I will certainly have to sue for the consequences of your breaches.

I'm sorry to hear that you, too, now no longer have assets or income and thus can't make payments on properties that you've committed to purchasing over and over and over, but it's best that if you've become insolvent due to COVID-19 or other issues, that we deal with the consequences now so that we can all get past these issues... the sooner the better.

Please know that if I'm forced to sue you week after next, I will still be willing to work something out.  It would be crazy for you to waste $200k+ on legal fees and then pay a multi-million dollar judgment when it will be so easy to work something out.

--Carl  +1 936 937 2688