CARL A. WESCOTT
8210 E. Via de la Escuela
Scottsdale, AZ 85258
*in propria persona*
WESCOTTCARL2022@GMAIL.COM
+1 936 937 2688

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| CARL A. WESCOTT, <br><br> Plaintiff, <br><br> vs. <br><br> MR. WILLIAM "RANDY" RUSS, et al. <br><br> Defendants. | Civil Action No. **1:22-CV-00785 - LY** <br><br> **EXHIBIT A: SWORN AFFIDAVIT AND DECLARATION OF CARL WESCOTT** |

I, Carl A. Wescott, hereby swear under penalty of perjury of the laws of Texas and of the United States of America, that the following facts are true

1. I am 55 years old, and a resident of Scottsdale, Arizona.
2. I am competent to testify.
3. Were I to be called to testify in this matter, my testimony would be as follows, and until that point, my written testimony is as such:
4. All of the facts cited in my original legal complaint are true, to the best of my recollection.
5. I made it clear where I am relying on memory, such as the purchase price for the two real property purchase contracts at hand.

1

## **Breach of Contract**

6. Mr. David Maksymuik sent me two signed, written purchase offers for P2 and P3, each an all-cash offer (via email).

7. I accepted each written offer in writing, thus forming the two written purchase contracts for real property.

8. From memory, the all-cash purchase price of each property was US $1,236,000.

9. In my Amended Verified Legal Complaint, I had pled the existence of those valid, enforceable, binding written contracts:

> 146. The Plaintiff had sold the properties to the Defendants (with the company if they so desired), as per the original two written contracts formed between the parties and early modifications. (Defendants also committed to buying a neighboring property, P1, from a different company of the Plaintiff's). All three purchases were to close in December 2018 or January 2019.
> 147. Mr. Maksymuik, as agent for Mr. Russ and for their Las Olas partnership, provided written purchase offers for P2 and P3 in 2018.
> 148. The purchase price for P2 was US $1,236,000 (from memory; the Plaintiff does not have the written contract in his possession).
> 149. The purchase price for P2 was US $1,236,000 (from memory; the Plaintiff does not have the written contract in his possession).
> 150. The Plaintiff accepted both offers in writing, thus forming contracts with Russ and Maksymuik and their Las Olas partnership.
> (*Plaintiff's Amended Verified Legal Complaint, paragraphs 146 to 150, pp. 28-29*)

10. In 2019, I was evicted from my former residence, and lost most of my files, then.

11. Through 2019, I had copies of those contracts.

12. Mr. Maksymuik and Mr. Russ will provide them in response to discovery requests.

13. Because Las Olas was to have millions of dollars in sales in 2018, the all-cash property sales were to close by January 2019.

14. The above facts represent the material terms to the original binding, valid, enforceable written contracts.

15. I was the seller of the two real properties.

16. I fully performed, even signing over control/title to the two real properties in question (along with a third one that is the subject of a different contract) in 2018.

17. I travelled to Ecuador to do so in 2018.

18. Mr. David Maksymuik took responsibility for handling all of the legal side of the purchases.

19. Mr. Maksymuik asked me to sign over power of attorney on his behalf and to the company that owned Las Olas.

20. I did so with the Las Olas attorneys.

21. I did so partially because I trusted Mr. William "Randy" Russ, and largely because of the written and oral promises made to me about upcoming Las Olas sales.

22. I myself had had a successful real estate development project in Ecuador, in Vilcabamba, that generated millions of dollars a year in sales, so it was quite believable that Mr. Russ and Mr. Maksymuik could also have success selling real estate in Ecuador, especially with beach and beach-adjacent properties.

23. I also was and am familiar with the value of the Las Olas properties, with a US $58 million value As Developed assigned and calculated by Dr. Rene Torres, an appraiser I know and believe to be extremely competent.

24. Dr. Torres is a Harvard MBA and Harvard Ph.D., with 50 years' commercial appraisal experience – I trust his values.

25. Thus, the Defendants can easily perform and pay me the money they owe me, worst case, by borrowing against the Las Olas properties, that they owned free and clear.

26. At this point, the Defendants have had control of my former properties for years.

27. The Defendants have paid less than 10% of what they owe me on each property.

3

28. Mr. Russ and I agreed on the accounting of payments earlier this year.

29. The last payment Mr. Russ made was in February 2022, for US $5,000

30. In our agreed accounting, the total of the payments made on P2 and P3 is $88,466:

> Per Mr. Russ' and Plaintiff's agreed accounting and allocations of payments, the Defendants have paid $44,233 towards P2 and $44,233 towards P3 (*Plaintiff's Verified Amended Complaint*, paragraph 166, page 31)

31. Thus, Defendants still owe me $2,383,534 of the original purchase prices, plus prejudgment interest, not to mention the consequential damages that come with a breach of contract.

32. The Defendants' not paying me for properties I already signed over has significantly damaged me, way beyond the $2,383,534 owing, as shall be fully proven at jury trial.

33. I never heard from David Maksymuik anything other than that he and his business partner would pay for the P2 and P3 properties.

34. Up through May 2022, Mr. William ("Randy") Russ also had been consistent in his communications to me, that he and his business partner, and his development project Las Olas, were going to pay for P2 and P3 properties.

35. June 4th, 2022, was the first time that Mr. Russ ever expressed to me that he might not pay for the P2 and P3 properties.

36. I found that quite surprising.

37. Given that Mr. Russ and Mr. Maksymuik already control the properties via my power of attorney, I guess they're now thinking once again of how they can steal those properties from me by not paying what they owe.

38. After years of promises to pay what's owed, and years of small payments, Mr. Russ' repudiation, and the thought of he and Mr. Maksymuik stealing my former properties, are what motivated me to file my legal complaint.

4

### Promissory Fraud

39. Mr. Russ and Mr. Maksymuik did indeed represent that they would have millions in sales per year, as per my Amended Verified Legal Complaint:

> 108. Russ and Maksymuik represented that Las Olas would have millions in sales by calendar year 2018, and that they could quickly pay cash, in full, first for P1, and then for P2 and P3. (*Plaintiff's Verified Amended Complaint*, paragraph 108, page 23)

40. Getting more specific about our meeting dates in California where they first made those representations, we met on Wednesday, August 30th, 2017; Thursday, August 31st, 2017; and Friday, September 1st, 2017.

41. At the time, I was house-sitting at 840 Loma Vista in Moss Beach, California, where we met two or three times.

42. We also met at Mr. Russ' and Mr. Maksymuik's hotel in San Mateo and also met over dinner at a Red Lobster in San Mateo, California.

43. The promises to pay, and the representations about Las Olas' sales revenue being about to be in the millions of dollars per year, both were material.

44. Both turned out to be false. Mr. Russ and Mr. Maksymuik must have known those promises and representations were false at the time they made them.

45. In the alternative, Mr. Russ and Mr. Maksymuik **should** have known that they would not have millions in sales revenue for Las Olas in 2018.

46. Indeed, here in 2022, per Mr. Russ and per Mr. Wayne Stauble, real estate agent on the ground in Bahia, Ecuador, Las Olas is not in sales due to some permitting issue with the local government.

47. (Mr. Maksymuik stopped responding to me years ago, but Mr. Russ was responsive to me through June 2022).

48. I now believe that Mr. Russ and Mr. Maksymuik lied to me about upcoming Las Olas sales revenue to get me to accept the purchase contracts.

49. I likely would have accepted the purchase contracts anyways, given that I knew and know that Mr. Russ has significant assets and income, and that Las Olas also has a significant value. In other words, without those lies and misrepresentations, I likely still would have accepted the purchase offers and entered into contract to sell P2 and P3 to Defendants.

50. Here's the key, though: there's no way I would have signed over control of the properties to David Maksymuik and to Las Olas without those false promises to pay.

51. Having done so has left me in a far worse position, as now I don't own the properties, and couldn't sell them to someone else.

52. Of course, more than three years after I signed over the properties and their control via power of attorney, and more than three years after the anticipated closing and payment dates of January 2019, the only fair resolution to my issues is to pay me the $2,383,534 owing.

53. I should also be paid pre-judgment interest on the monies owed.

54. Finally, as breach of contract provides consequential damages, and I have quite significant consequential damages that were and are foreseeable to Mr. Russ and his partner, I should be paid for the loss of those collateral opportunities.

55. Those issues and damages were foreseeable as I informed Mr. Russ of my circumstances, and the ramifications of my not having money.

56. Mr. Russ had performed on the first part of the Parties' other contract (for P1), wiring close to US $20,000 per month to various parties including US $5,000 per month to me.

57. I was familiar with Las Olas and the ease of development in Ecuador.

58. I developed real estate there myself before and was quite successful doing so with a partner (Joe Simonetta).

59. Joe and I sold out multiple phases of a development (Hacienda San Joaquin in Vilcabamba, Ecuador).

60. I was and am familiar with Mr. Russ' business Bobby Castle Construction, that makes margin on more than 100 contractors at a time.

61. I was and am familiar with the the market value of Las Olas, worth over US $58 million (*Plaintiff's Amended Legal Complaint, Exhibit F*), owned free and clear (as per the appraisal in *Plaintiff's Amended Legal Complaint, Exhibit F*).

62. I believe that the Defendants had and have the ability to pay even without the Las Olas sales, or at least Mr. Russ, Bobby Castle Construction, and Las Olas had the ability to pay.

63. The Defendants could have borrowed against Las Olas to pay me, and still can (worst case) if required to honor their contracts and pay amounts long over-due (3+ years), as they should be.

### Promissory Estoppel

64. The Defendants' attorneys' argument related to promissory estoppel relies on a complete misstatement of the facts: "Here, the alleged promise was to buy the P2 and P3 lots at some point in the future if Defendants could afford to do so."

65. I believe this represents an attempt to mislead this Court, contrary to Model Rule 3.3, Candor Toward the Tribunal.

66. Quite the contrary; the Parties' contract promised all-cash purchases.

67. I believe the only equitable remedy to this situation is for Defendants to perform and pay the rest of the monies owing, plus prejudgment interest, plus consequential damages to be fully proven at jury trial.

7

### Statute of Limitations - Tolling

68. Though Mr. Maksymuik offices in Texas (*Plaintiff's Amended Verified Legal Complaint*, Exhibits A1 and A2), it is my understanding that he has been in Ecuador the majority of the time over the past four (4) years, managing the Las Olas development project for the partners (Mr. Russ and Mr. Maksymuik).

69. Mr. Russ also travels significantly, going to Ecuador for Las Olas needs, going to China and other countries to source materials for Texas Fixtures, and traveling through the United States as Bobby Castle Construction is a national builder, with projects in more than a dozen states at any one time.

70. Based on many conversations with Mr. Russ over the past four years, it would be my best guess that Mr. Russ is out of the state of Texas more than three (3) months each year.

### Statute of Limitations – Abuse of Process

71. I only discovered and confirmed the secret, hidden lawsuit with a faked proof of service in talking to Jeff Barringer in May and June this year, 2022.

72. Mr. Barringer is willing to voluntarily testify as to these facts and others.

73. Defendants' attorneys accuse me of baseless rants, but I will be supplying Mr. Barringer's affidavit under oath, and some emails between the parties that Mr. Barringer has, to show that the Defendants did indeed induce Mr. Barringer to file that secret lawsuit with a faked proof of service.

74. Given that I was not actually served, I was unaware (until recently) that Mr. Barringer had obtained a judgment against me in Ecuador using the law office of my own Ecuador attorney, Ms. Floridalva Zambrano.

## Conclusion

75. I've been harmed by the tortious acts and non-acts of the Defendants, who owe me $2,383,534 of the original contracted purchase prices of P2 and P3, plus prejudgment interest, not to mention the value of lost collateral opportunities.

76. I transferred control and possession to the properties to Mr. Maksymuik and Las Olas years ago.

77. At the time, Mr. Maksymuik took responsibility for completing the transfer of title by January 2019 (our planned close).

78. Mr. Maksymuik no longer responds to me.

79. Mr. Russ has, through May 2022, continuously acknowledged his debt to me.

80. Mr. Russ has, through May 2022, made promises to pay me the monies he owes.

81. The last payment from Mr. Russ was $5000 he paid me in February 2022, so the acknowledgements of debt, promises to pay, and payments have all been recent (this year, 2022).

82. I believe that the only fair solution is to be paid the monies owed to me, plus interest.

## Future Attorney

83. I'm a legal layperson who has tried to do a good job on my legal complaint, despite the complaints of Defendants' attorneys.

84. I cannot afford an attorney (due to this situation), but I've talked to contingency attorneys.

85. I plan to get a contingency attorney as soon as possible for this case, to help me take this case to jury trial, assuming the Defendants don't settle along the way.

FURTHER AFFIANT SAYETH NAUGHT. Signed November 8th, 2022

_____
CARL A. WESCOTT

9